**UNITED STATES of America, Appellee,**

**v.**

**Steven YOUNG, a/k/a "Train", Alliebe Afflic, a/k/a "Alliebe Myers", Lloyd Ward a/k/a "Omar", a/k/a "Amar", a/k/a "A", Tangee Afflic, Charles Caviness, a/k/a "Caddy", a/k/a "Catty", and Freddie Myers, a/k/a "New York Freddie", Defendants-Appellants.**

**Nos. 897, 931, 879, 932, 900 and 899, Dockets 83–1364 to 83–1367, 83–1379 and 83–1393.**

United States Court of Appeals, Second Circuit.

Argued March 19, 1984.

Decided Sept. 17, 1984.

Marc J. Gottridge, Asst. U.S. Atty., S.D. N.Y. (Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., Barry A. Bohrer, Asst. U.S. Atty., New York City, of counsel), for appellee.

George R. Goltzer, New York City (Goltzer & Adler, New York City, of counsel), for defendant-appellant Young.

James M. Horan, Oakland Gardens, N.Y. (Herald Price Fahringer, New York City, of counsel, Diarmuid White, Legal Asst., on the brief), for defendants-appellants Alliebe Afflic and Tangee Afflic.

Raymond G. Leffler, New York City, for defendant-appellant Ward.

Lawrence F. Ruggiero, New York City, for defendant-appellant Caviness.

Herald Price Fahringer, New York City (Mark F. Pomerantz and Anne C. Feigus, New York City, of counsel), for defendant-appellant Myers.

Before MANSFIELD, NEWMAN and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

Steven Young, Alliebe Afflic, Lloyd Ward, Tangee Afflic, Charles Caviness, and Freddie Myers appeal from judgments of

conviction entered on jury verdicts after a five week trial before Judge Sand in the District Court for the Southern District of New York. Each appellant was convicted of conspiring to distribute heroin and to possess heroin with intent to distribute in violation of 21 U.S.C. § 846 (count one). In addition, Myers was convicted of conducting a continuing criminal enterprise in violation of 21 U.S.C. § 848 (count two), and Tangee Afflic was convicted of receiving and possessing an unregistered automatic rifle in violation of 26 U.S.C. §§ 5861(d) and 5871 (count three). The jury also rendered a special verdict on the continuing criminal enterprise count, finding that approximately $3,000,000 of Myers's assets, including his house, were subject to forfeiture under 21 U.S.C. § 848(a)(2).

Judge Sand sentenced Myers to 40 years' imprisonment and a $100,000 fine; Ward to 15 years' imprisonment and a $10,000 fine; Young and Caviness each to 10 years' imprisonment and a $5,000 fine; Alliebe Afflic to 7 years' imprisonment and a $5,000 fine; and Tangee Afflic to 18 months' imprisonment. With the exception of Tangee Afflic, who is at liberty on bail pending this appeal, appellants have already begun serving their sentences.

On appeal defendants raise a myriad of issues, the most significant of which are (1) whether the § 846 conspiracy charged against Myers in count one was an eligible predicate offense for the § 848 continuing criminal enterprise charged against him in count two; (2) whether a search of Tangee Afflic's apartment was supported by probable cause where it was triggered by a signal from a police dog indicating (erroneously) that narcotics were present; (3) whether a warrant authorizing the search of Myers's house specified the "things to be seized" with sufficient particularity to satisfy the fourth amendment; (4) whether the extensive use of expert testimony by agents involved in the investigation of this case deprived appellants of a fair trial; (5) whether the evidence was sufficient to support the conspiracy convictions of Young, Ward, Caviness, and Alliebe and Tangee Afflic; and (6) whether the evidence was

sufficient to sustain the forfeiture verdict as to Myers's home.

For the reasons set forth below, we affirm the convictions on all counts except for the conspiracy count against Tangee Afflic, which was not supported by sufficient evidence. However, we agree with Myers that there was insufficient evidence to support the jury's special verdict as to the forfeiture of his home, and we therefore vacate the corresponding portion of the judgment of forfeiture entered by the district court.

## I. BACKGROUND

This prosecution was the product of a 10 month investigation by the federal Drug Enforcement Administration (DEA) with the assistance of the police departments of New York City, the City of New Rochelle, the City of Mount Vernon, and Westchester County. According to an affidavit filed by Wilfred Garrett, the DEA agent who supervised the case, the investigation began in the spring of 1982, when the DEA obtained information from a variety of sources, including a confidential informant, a telephone book confiscated from an arrested heroin dealer, and telephone company records, suggesting that Myers, who had previously been convicted of federal narcotics violations, was involved in the trafficking of substantial quantities of heroin. Acting on this information, the DEA initiated surveillance of Myers at his home at 205 Bradley Avenue in Mount Vernon, and his office at 1650 Broadway in Manhattan.

After eight months of wider surveillance had implicated Caviness, Young, and Alliebe Afflic, among others, and after the DEA had obtained corroboration from several other confidential informants, the government obtained an order from the district court, dated January 6, 1983, authorizing the interception of telephone calls to and from two telephone numbers at Myers's Mount Vernon home for 30 days. On February 4, 1983, that order was extended for an additional 30 days and broadened to include the two telephones at

Myers's Manhattan office. Numerous calls were intercepted and recorded, which, together with intensified surveillance, implicated Ward and Tangee Afflic, among others. The investigation culminated in a series of searches in early March 1983, all but one of which were conducted pursuant to warrants.

## A. The Government's Case.

As Judge Sand noted toward the end of this five week trial, all of the evidence against defendants was circumstantial. Because of this, and because each appellant has in one form or another challenged the sufficiency of the evidence, we find it necessary to review the government's case in considerable detail.

### 1. Overview.

The theory of the prosecution was that Myers headed a large scale operation that was involved primarily in the distribution of heroin on a retail basis in Harlem. Ward was depicted as Myers's "principal business partner". Caviness and Young were portrayed as "lieutenants" in charge of the day-to-day affairs of the business. Keith Anderson, who was not tried for reasons unrelated to this appeal, allegedly operated a "mill" at which relatively pure heroin was "cut", *i.e.*, diluted for street-level distribution. Alliebe Afflic, Myers's common-law wife, and her two daughters, Tangee and Valerie, the latter of whom was acquitted, were allegedly "couriers" who delivered packages of heroin to street-level pushers. The remaining defendant at the trial, William Bivens, was supposedly one such pusher, but he, too, was acquitted by the jury.

### 2. The March 6, 1983 Searches and Arrests.

Much of the evidence introduced by the government at trial was obtained on March 6, 1983 in a series of searches at seven locations belonging to or associated with the defendants. On that day, Myers's house, his and Anderson's offices, Ward's house, and the apartments of Young and Anderson were all searched pursuant to warrants; Margaret Nicks, Caviness's common-law wife, consented to a search of her apartment.

### (a) The Search of Myers's House and the Arrests of Myers and Alliebe Afflic.

At Myers's lavishly furnished home in Mount Vernon, agents discovered evidence of great wealth. An astounding amount of cash was seized: $757,940 was found stuffed in a large black suitcase in the attic crawlspace; $580,100 was found in a safe in a master bedroom closet; $40,000 was found in a woman's handbag in another master bedroom closet; and $1200 was found on top of a dresser in that room. In all, $1,379,240 in cash was confiscated.

An equally astounding amount of jewelry, valued at $1,371,105, was also seized. So were two Mercedes-Benz automobiles and 29 fur coats bearing the embroidered names or initials of Myers and Alliebe Afflic.

In addition to two shotguns, agents also discovered numerous photographs and documents that linked Myers and Alliebe Afflic with co-defendants Ward, Young, Caviness, and Anderson. Among the documents was a bill reflecting the sale of $75,000 worth of jewelry by Myers to Anderson and a certificate of title to a Jeep registered to Young.

Myers and Alliebe Afflic were present at the time of the search and were placed under arrest pursuant to a warrant. After they were advised of their constitutional rights, they were taken to a DEA office for processing, along with the other five defendants arrested that day. Upon encountering co-defendant Ward, Myers remarked, "You have my whole crew here. It looks like we are going to have a party here tonight."

### (b) The Search of the Offices of Myers and Anderson.

Numerous documents and other exhibits were seized during the search of Suite 1210

at 1650 Broadway, the location of Myers's purported businesses: Rissa Chrissa Entertainment Consultants, Inc. and Myers & Associates Consulting, Inc. Papers seized there established that Myers was Rissa Chrissa's "executive vice president" and owned 50 percent of its stock. Business cards there indicated that Anderson, who had an office in the Rissa Chrissa suite, was a Rissa Chrissa "representative". Other documents showed that Myers leased an apartment at Harmon Cove Towers in Secaucus, New Jersey, at a monthly rental of $1,520, paid for that apartment from the checking account of Myers & Associates Consulting, and took weekly salaries of $650 from Rissa Chrissa and $500 from Myers & Associates Consulting. In Myers's desk agents also found an electronic device for the detection of tape recorders and electronic transmitters.

(c) *The Search of Anderson's Apartment.*

In a back room of Anderson's apartment at 984 Sheridan Avenue in the Bronx, agents discovered what the government contended at trial was a heroin "mill", equipped to "cut" heroin for street-level distribution. The room featured a large table covered with a white powdered residue. Using a vacuum cleaner with a special filter, a DEA chemist collected dust samples from a rug in the mill and from its perimeter. Subsequent chemical analyses showed that these dust samples contained traces of heroin. Further, residue on a plastic strip found in the mill also was determined to contain heroin with a purity in excess of 80 percent.

In addition to the heroin traces, a total of approximately 650 pounds of mannite was found in Anderson's apartment. Most of the mannite was contained in 17,000 packages bearing the brand name "Juppa", packed into 28 large cartons. Approximately 100 pounds of quinine were also recovered from Anderson's apartment. Special agent Magno testified as an expert that "in your better run organizations, they will use principally quinine and mannite" to cut heroin.

Among the other items that were seized from the mill were a measuring spoon, a heat sealer for sealing plastic bags, seven boxes of plastic bags, 14 wire strainers, playing cards, and shower caps. Special agent Magno testified that this type of paraphernalia was commonly used for cutting heroin.

The agents also discovered in Anderson's apartment a shotgun and bullets suitable for use in an automatic pistol. Various papers were seized as well, including telephone messages taken by Anderson from Myers and Rissa Chrissa business cards bearing the names of Myers and Anderson. One of the cards bore the handwritten notation "Train" (Young's nickname), and the notation "Eighth Avenue, 145th and 146th Street downtown, Ace Barber". Finally, the agents found three laundry tags bearing the name "Afflic", which proved to be an important link in the government's case against Alliebe Afflic.

(d) *The Search of Ward's House.*

The search of Ward's private residence in Teaneck, New Jersey yielded more than 90 pieces of gold and diamond jewelry; a safe containing a .38 caliber revolver loaded with "hollow point" bullets, $7,300 in cash, and a diamond ring; nine fur coats bearing Ward's nickname "Omar" and the name of his wife Dorthula; and keys to two safe deposit boxes.

On March 7, 1983, a search of Ward's safe deposit box at the U.S. Safety Deposit Corporation in Manhattan, pursuant to a search warrant, revealed $60,020 in cash as well as two diamond rings. The aggregate value of the jewelry seized from Ward's house and his safe deposit box was $236,-655. In addition, two Mercedes-Benz automobiles were found in his driveway, and documents showing his interest in these automobiles were found in his house.

Also seized from Ward's house were a series of imprinted business cards for "Myers & Associates Consulting, Inc.", "Rissa Chrissa Records", and "Rissa Chris-

sa Entertainment Consultants", all bearing the name of Freddie Myers; a telephone book that listed, among other things, the numbers of defendants Caviness (under the entry "Cad") and Young (under the name "Train"); a telephone bill for Ward's home telephone, showing five telephone calls to Anderson's apartment and other calls to Myers's home; and photographs of Ward with Myers, Caviness, Young, Anderson, and Alliebe Afflic, which were identical to some of the photographs found at Myers's home. Other documents seized from Ward's home reflected large expenditures, including the construction of a 16'×32' swimming pool for over $41,000, and the rental of a $975 apartment at Harmon Cove Towers, the New Jersey luxury apartment complex in which Myers had also rented an apartment.

### (e) The Search of Margaret Nicks's Apartment.

At the Bronx apartment of Margaret Nicks, Caviness's common-law wife, the searching agents seized an Ohaus triple-beam balance scale, which special agent Rooney testified was commonly used to measure narcotics that are being cut. They also found $17,685 worth of jewelry belonging to Caviness, and two sets of keys on a chain with a plastic tag bearing a large letter "C". Two of these keys opened the only two functioning locks on the door to the "mill", Anderson's apartment.

### (f) The Search of Young's Apartment.

At Young's residence, Apartment 6A at 1600 Sedgwick Avenue in the Bronx, the agents found an Ohaus triple-beam balance scale, similar to the one found in Margaret Nicks's apartment, as well as a variety of holsters and live ammunition, a jacket containing traces of lactose, another commonly used cutting material, and a substantial amount of jewelry. Other evidence seized in Young's apartment included stock certificates indicating that he owned 50 percent of the Best Yet Car Service, located in the Bronx; two personal telephone books containing the telephone numbers of Ward (under the nickname "Amar"), Anderson (under his first name, Keith), and Myers (under "New York F"); and two photographs, depicting Young with co-defendants Myers, Caviness, Ward and Anderson.

### (g) The Search of Charles Afflic's Apartment.

The final search that took place on March 6, 1983, at the apartment of Charles Afflic, Alliebe Afflic's son, also yielded incriminating evidence. However, Judge Sand granted Charles Afflic's pretrial motion to suppress the fruits of this search on the ground that the search warrant was not supported by probable cause. As a result of this ruling, the government dropped Charles Afflic from the case prior to trial.

### 3. The Investigation Prior to March 6, 1983.

### (a) Surveillance of Defendants' Activities.

The jury learned of defendants' activities prior to March 6, 1983 through the testimony of officers who had conducted surveillance during the investigation. This testimony revealed Myers's close relationship with Young and Caviness and the apparent degree of trust he placed in them. For example, Young was seen entering Myers's garage when he was not at home. Similarly, Young and Caviness sometimes drove Myers's cars, and frequently chauffered him to and from his office in Manhattan.

Surveillance also established that Young was associated with co-defendants Ward and Bivens. At one time Young drove his Cadillac to the New Salaam Restaurant on Lenox Avenue, which was managed by Ward. Young parked the car in front of the restaurant and went into the restaurant with an unidentified companion. After one or two minutes, Young and his companion walked out of the restaurant and were approached by Bivens. Thereupon, Young reached inside his jacket and pulled out a small package that "was white and * * * appeared to be clear plastic", and handed

the package to Bivens, who put it inside his jacket and walked away from the area.

Further surveillance linked Ward with Caviness. Caviness was seen driving to the Ace Barber Shop on Eighth Avenue near 145th and 146th Street in Manhattan, a location that was also linked to Anderson through a written notation on a Rissa Chrissa business card found in Anderson's apartment. After double-parking his car, Caviness entered the barbershop without carrying anything, and returned less than two minutes later with a package which he put in the glove compartment. He then drove to the New Salaam Restaurant, where he met Ward.

Like Ward, Young, and Caviness, Alliebe and Tangee Afflic were also the subjects of extensive surveillance. On one occasion, Alliebe Afflic was seen driving to West 116th Street, where she gave a brown bag to an unidentified man who immediately entered a building that was surrounded by 25 to 30 people. The government offered expert testimony that these people "were waiting to purchase drugs."

On another occasion, Alliebe Afflic drove to Fifth Avenue between 119th and 120th Streets, accompanied by her daughter Valerie. After double-parking the car, Alliebe Afflic waited for almost ten minutes until Bivens approached. Reaching into the car and grabbing a folded newspaper that contained a small black bag, Bivens tucked it under his arm and walked across Fifth Avenue.

On a third occasion, Alliebe Afflic drove with Tangee Afflic to the vicinity of the building in which Myers maintained his office in Manhattan. The women parked the car in a garage on 52nd Street and walked toward the office building. Tangee Afflic was carrying a shopping bag. After turning onto Seventh Avenue, Tangee Afflic came back around the corner and stared directly at detective Magaletti, the surveillance officer. The women then continued toward the office building, "both looking all around." Tangee Afflic went directly into the 51st Street entrance of the building, while her mother walked further down

the block, turned around and entered the building. When Alliebe and Tangee Afflic left the building together about 15 minutes later, neither was carrying anything.

The following day, Tangee Afflic was seen in front of 1600 Sedgwick Avenue in the Bronx. She brought "a small white package, or small white bag" out of the building and handed it to Alliebe Afflic, who was seated in her car, parked outside the building. Alliebe Afflic then drove home.

Additional surveillance, some of which was videotaped and played for the jury, linked Bivens to a building with a red door on Fifth Avenue between 118th and 119th Streets. At various times, a dozen or more people congregated in front of this location. Bivens appeared to control their access to and from the building. In addition, on one occasion, Bivens was seen on West 120th Street, handing an unidentified woman "[a]bout twelve" "glassine bags or little packages", which he counted out in exchange for money.

Officer Hight was permitted to narrate as the government played for the jury a videotape of activities at the "red door" location. In addition, as the government's expert on street-level narcotics transactions, he testified that in his opinion, there was a narcotics "shooting gallery" behind the door, the people in front of the door included "lookouts" and "touts", and some of the other people observed during the surveillance were distributing heroin.

### (b) The Intercepted Conversations.

Several of the intercepted conversations that were played for the jury purportedly shed further light on the relationship among various defendants. For example, Myers gave Caviness what the government contended were "coded" instructions about a narcotics transaction he wanted to take place on 112th Street in Harlem. Using the name "Pleasure", Myers called Young at the Best Yet Car Service office, and asked to speak to Caviness, whom he directed in the following manner:

MYERS: Yeah, ah, what you, what I was telling you about the, uh, uh, uh, Twelfth Street, uh, do that by yourself, that part.

CAVINESS: Uh, huh.

MYERS: Y'know? And, ah, y'know and the fellow go ahead, and, and be with his lady.

CAVINESS: Yeah.

MYERS: Understand? What, where we're talking about around Twelfth Street.

CAVINESS: Yeah.

MYERS: Y'understand?

CAVINESS: Uh huh.

MYERS: And, that way, that'll be cool.

CAVINESS: O.K.

Similarly, Myers castigated Ward for not bringing something to him on time, but did not suggest what he was referring to. Myers reminded Ward that he had told him "[E]ither give it to me late Tue-, Monday, or early Tuesday," and complained about not hearing from Ward until 2:30 P.M. on Tuesday. He reiterated that "[t]he last thing I told you was I said, man, either come see me late Monday, or see me early Tuesday, so I can take care of my business!" Finally, he instructed Ward to "come on up so I can take care of that."

Along the same lines, one "Lee" called Myers's office and told Ward that he "left somethin' * * * in the drawer for Fred * * * in two little bags." He told Ward to look for them, and to give them to Myers if he did not show up.

Finally, Myers was connected to Anderson's apartment by a telephone call made to Myers at his office. On February 24, 1983, a woman named Robin Majors called Myers to make arrangements for a trip that Myers, Ward, and others were taking to Atlantic City. When she asked Myers if there was a place she could leave a message late at night, Myers asked Anderson for "the number uptown to the apartment with the machine on it." Myers then gave Majors the telephone number of Anderson's Sheridan Avenue apartment, the "mill", which was equipped with a telephone answering machine.

(c) *Defendants' Efforts to Detect and Elude Visual and Electronic Surveillance.*

There was also evidence that many defendants were aware that they were subject to the surveillance and sought to avoid it. For example, Myers, Caviness, and Young frequently drove their cars as if they were seeking to determine whether they were being followed, and if so, by whom. On one occasion, soon after Caviness had driven to Myers's home in Myers's blue Mercedes-Benz, Young, who was driving Caviness's BMW, suddenly stopped the car en route to Myers's house, remaining in the car and looking over his left shoulder for approximately five minutes. He then proceeded to Myers's house in the BMW and went inside. About one hour later, Young and Caviness left Myers's house and entered Caviness's car; Young was carrying a small light-colored package in his hand. Both men looked up and down the street before entering the car, as they frequently did before entering Myers's house. Thereafter, Caviness and Young drove at an unusually slow rate of speed.

Another time, while driving from Myers's house to Manhattan, Caviness pulled to the side of the road to let a surveillance car pass him. He then took a meandering tour of local streets in the Bronx—often starting and stopping erratically—taking about one hour for a distance ordinarily travelled in five minutes.

Similarly, while being tailed one time, Myers surprised the surveillance officer by abruptly leaving the West Side Highway at the 79th Street exit. Myers immediately returned to the highway and followed the surveillance vehicle to the vicinity of 57th Street.

Defendants' sensitivity to surveillance by law enforcement officers was demonstrated not only by their actions in response to visual surveillance, but also by their own words. In several wiretapped conversa-

tions, they specifically talked about detecting or eluding surveillance. Intercepted conversations also revealed defendants' concern that their telephones might be wiretapped. For example, in two telephone conversations with Charles and Tangee Afflic, Alliebe Afflic said that the telephones were "messed up". On one such occasion, she told Tangee Afflic to be "careful" not to talk in her home.

A similar exchange took place when Alliebe Afflic called Myers to inform him that one Tito Johnson had just been arrested by "the Feds" after "five pounds" of "stuff" had been found in an apartment where Johnson had been staying. Myers responded by making a transparent attempt to change the subject, saying, "Uh huh, so I didn't know nothing about it. I ain't seen the motherfucker in a hundred years. * * * I know you didn't call me to tell me that."

(d) *"The Flash Inn Incident"*.

One of the more important episodes in the investigation was the so-called "Flash Inn Incident". On January 14, 1983, at 9:34 P.M., a man identified only as "Joe" placed a call from one of Myers's home telephones to another man named Rudy at a bar in Queens called "Mr. Ugly". Joe suggested that they meet at "The Flashin' Inn". When Rudy hesitated, Joe said to Myers, "He don't know how to get there too good. Anywhere else, Freddie?" Although Myers suggested a Mobil gasoline station on 125th Street, Rudy ultimately agreed to meet at "The Flashin' Inn". Joe asked Myers when they would leave to go to this meeting and Myers said, "Half an hour."

After this conversation, Myers and an unidentified man were followed as they left Myers's house and travelled in Myers's car to the Flash Inn, a bar located on the Manhattan side of the Macombs Dam Bridge. Myers and his passenger remained in the car with the engine running and the lights on for approximately 25 minutes. A white Lincoln with Pennsylvania license plates occupied by two unidentified men then pulled up about 15 feet from Myers's car. The driver of the Lincoln approached Myers's Mercedes-Benz, talking with Myers and his passenger for a few minutes before returning to the Lincoln. All four men then entered the Flash Inn. Myers's passenger carried a small light-colored handbag.

Two minutes later, Myers's passenger came out of the bar, looking back and forth, this time carrying a dark-colored handbag, which he placed in the trunk of the Lincoln. He then returned to the Flash Inn. Two minutes later, Myers emerged from the Flash Inn, went to his car, and drove away by himself.

Notwithstanding the agents' failure either to apprehend the principals involved or to seize either of the handbags that were exchanged at the Flash Inn, detective Magaletti, one of the agents who witnessed the incident, testified as an expert "that it was a narcotics transaction that took place." He went on to explain that "[t]he telephone call was placed by a middleman to the buyer of the narcotics", that participants in transactions of this nature "talk coded", that the exchange took place at the Flash Inn, a public place, to avoid a possible "rip-off", and that the middleman, rather than Myers, carried the narcotics into the Flash Inn, so that "[if] they are stopped going to the door the middleman's got it, not Freddie."

(e) *The Seizure of an M–16 A1 Automatic Rifle at Tangee Afflic's Apartment.*

On February 27, 1983, one week before the other searches in this case, DEA agents executed an oral search warrant at Tangee Afflic's apartment, Apartment 7A at 1600 Sedgwick Avenue in the Bronx. Tangee shared this apartment with Young, although Young also maintained an apartment of his own in the same building.

As discussed in detail in Section II B *infra*, this search warrant was based in part on a signal from a police dog indicating that narcotics were present in the apartment. In fact, none were found there, but behind a dresser near the bed in

Tangee's bedroom agents found an automatic rifle and two loaded magazines, with a total capacity of 50 shells. This rifle was the subject of the firearms violation alleged in count three of the indictment. Also seized from Tangee's bedroom were two fur jackets, one bearing the name "Tangee" and a picture of a train ("Train" was Young's nickname), and gold jewelry worth a total of $6,120.

Shortly after the search warrant had been executed, at 7:32 A.M., Myers called Young at his own apartment, one floor below Tangee Afflic's. He told Young that "the Feds just went in Tangee's house, man, and kicked the door down" and that "[t]hey got dogs up in the house, sniffing". Reporting that the agents had seized a gun, Myers said, "I don't think they found nothing but that though." Myers told Young that "[i]f they had dogs, you know what they're looking for," leading Young to speculate that his own conduct might have occasioned the search:

> YOUNG: You know what they're probably looking for? 'Cause I had came in here with a fucking bag and my briefcase.
>
> MYERS: Yeah.
>
> YOUNG: When, ahh, when my motherfucking, you know my books were in the store.
>
> MYERS: Yeah. Yeah.
>
> YOUNG: Yeah, That's probably what happened.

4. *Evidence of the Lack of Any Legitimate Source for Defendants' Wealth.*

The final component in the government's case was a series of income tax returns demonstrating that neither Myers, Alliebe Afflic, Ward, Caviness, nor Young had any legitimate reported source of income that would explain their considerable wealth.

Myers, who in 1983 had over $3,000,000 in assets, listed income of only $18,500 and $7,000 in 1977 and 1978, respectively. And even this income he attributed to an unspecified source "Other" than wages or salary. In 1979, Myers reported a total of $4,950 in salary from Sound Place, Inc. and Rissa Chrissa. In 1980, Myers listed an adjusted gross income of $27,100, and in 1981, he reported a gross income of $22,449, nearly all of which was purportedly earned as an "Entertainment Consultant" working for Rissa Chrissa. On April 13, 1983, a little more than one month after his arrest in this case, when Myers applied for an automatic extension of time in which to file a 1982 federal income tax return, he stated that his 1982 tax liability was $11,115.

The government also sought to establish that Rissa Chrissa's financial condition could not have generated any legitimate, albeit unreported, income for Myers. Unaudited financial statements for Rissa Chrissa for the nine months ending September 30, 1982, showed total assets of $581, current liabilities of $80,000, a retained deficit of $79,619, and $43,663 net loss for the first three quarters of calendar year 1982. Rissa Chrissa's corporate income tax returns confirmed that the business, which began operation in 1979, had never made a profit.

Equally unimpressive was the financial condition of Myers & Associates Consulting, which was formed in April 1982. Other than "inconsequential" receipts, its corporate checkbook was the only financial record. That checkbook showed few deposits and few expenditures other than Myers's $500 weekly salary, rent and electricity for Myers's New Jersey apartment, and estimated tax payments on Myers's personal taxes.

Alliebe Afflic filed no federal income tax returns for the years 1977 through 1980, inclusive. In 1981, she listed $30,000 in "gambling winnings" as her only reportable income. For 1982, she filed a request for an automatic extension of the time to file a return, stating that she had incurred no income tax liability and that she had no taxes withheld and no estimated tax paid.

Although in 1983 he owned a home with a swimming pool, $236,655 in jewelry, two Mercedes-Benz automobiles, and rented a

luxury apartment, Ward filed no income tax return in 1977 and reported incomes of $6,500 in 1978, $7,800 in 1979 and $6,625 in 1980. In each of those years, he listed his occupation as "food clerk". In 1981, he reported a salary of $26,500, which he attributed to his position as manager of the New Salaam West Restaurant. Ward filed no return for 1982.

Young, who in 1983 had a Cadillac and a Jeep registered in his name and possessed over $16,000 in jewelry, reported income of $4,200 in 1977, earned while working for the Fort Wayne Candy & Cigar Co. in Pittsburgh; $4,888.45 in 1978, earned as a clerk with B. Jadow & Sons, Inc. in Manhattan; $9,132.95 in 1979, earned working for both Fort Wayne and Jadow; and $3,183.81 in 1980, earned as a stock clerk with Jadow. Young filed no returns for 1981 and 1982.

Caviness, who in 1983 possessed over $17,000 in jewelry and drove a 1982 BMW, filed no federal income tax returns for any year between 1977 and 1982, inclusive.

### B. The Defense Case.

Defendants Myers, Alliebe Afflic, Valerie Afflic, Tangee Afflic, and Bivens each presented evidence. To counter some of the government's expert testimony, Myers called Daniel Sweeney, a former policeman, who testified as an expert that the location depicted in the video tapes on which Bivens appeared was a "numbers" operation, not a narcotics distribution point. Myers also offered evidence that "Juppa" brand mannite could be purchased in a number of stores in Greenwich Village.

Alliebe Afflic called Clementine Stokes, an employee of the Broadway Exclusive Cleaners, who testified about laundry tags of the type found in Anderson's apartment. She also called William Rawald, a former member of the New York Drug Enforcement Task Force, who testified at great length concerning the operation of heroin mills in general, and suggested that Anderson's apartment was only a location from which cutting materials were sold. In addition, she introduced a stipulation concern-

ing the lack of identifiable fingerprints on the gun seized at Tangee Afflic's apartment. Tangee Afflic offered a stipulation and payroll records establishing her employment in a Manhattan daycare center.

Bivens testified in his own behalf, admitting that he was a "numbers runner", but denying that he sold narcotics. He testified that the Fifth Avenue building with the red door housed a numbers operation for which he worked. He also called several numbers customers to corroborate his testimony.

## II. DISCUSSION

### A. Myers's Conviction Under 21 U.S.C. § 848.

Myers's principal contention on appeal is that he was improperly convicted on count two of conducting a "continuing criminal enterprise" in violation of 21 U.S.C. § 848. More specifically, Myers contends (1) that the general narcotics conspiracy charged in count one under 21 U.S.C. § 846 was improperly charged as a predicate offense underlying count two's continuing criminal enterprise; and (2) that the uncharged predicate offenses, which were submitted to the jury in support of count two, and which arose out of the Flash Inn incident and Myers's alleged use of the telephone to conduct narcotics-related business, were flawed in several respects.

#### 1. The Statutory Scheme.

Title 21 U.S.C. § 848(a) makes it unlawful to engage in a "continuing criminal enterprise". Under § 848(b), one engages in such an enterprise if:

(1) he violates any provision of this subchapter [21 U.S.C. §§ 801–904] or subchapter II of this chapter [21 U.S.C. §§ 951–66] the punishment for which is a felony, and

(2) such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter—

(A) which are undertaken by such person in concert with five or more other persons with respect to whom

such person occupies a position of organizer, a supervisory position, or any other position of management, and

(B) from which such person obtains substantial income or resources.

As the statute has been construed by the fourth circuit, *United States v. Lurz*, 666 F.2d 69 (4th Cir.1981), *cert. denied*, 455 U.S. 1005, 102 S.Ct. 1642, 71 L.Ed.2d 874, 457 U.S. 1136, 102 S.Ct. 2966, 73 L.Ed.2d 1354 (1982), and by Judge Sand below, its "elements are divided in two parts. First, it is necessary to prove the predicate felony violation [referred to in subsection (1) ] (element one) and second, the other elements [referred to in subsection (2) ] must be proved." *United States v. Lurz*, 666 F.2d at 76.

■ With respect to the first of the statute's "other elements", the "continuing series of violations" required by subsection (b)(2), there is a consensus of authority that to establish a "series" the government must prove at least three felony violations. *United States v. Losada*, 674 F.2d 167, 174 n. 4 (2d Cir.), *cert. denied*, 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982); *United States v. Chagra*, 653 F.2d 26, 27–28 (1st Cir.1981), *cert. denied*, 455 U.S. 907, 102 S.Ct. 1252, 71 L.Ed.2d 445 (1982); *see United States v. Graziano*, 710 F.2d 691, 697 n. 11 (11th Cir.1983); *United States v. Phillips*, 664 F.2d 971, 1013 (5th Cir.1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982); *United States v. Valenzuela*, 596 F.2d 1361, 1364–65 (9th Cir.), *cert. denied*, 444 U.S. 865, 100 S.Ct. 136, 62 L.Ed.2d 88 (1979). This does not necessarily mean, however, that the government must obtain *convictions* on a minimum of three felony violations to establish a continuing criminal enterprise. *United States v. Lurz*, 666 F.2d at 78; *compare United States v. Gomberg*, 715 F.2d 843, 850 n. 4 (3d Cir.1983) (unnecessary to reach the question); *United States v. Michel*, 588 F.2d 986, 1000 n. 15 (5th Cir.) (same), *cert. denied*, 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1975). On a number of occasions, this court has affirmed § 848 convictions where the government apparently did not indict the defendant on three of the eligible predicate felonies in addition to the § 848 count, *e.g.*, *United States v. Calvente*, 722 F.2d 1019, 1020 n. 1 (2d Cir.1983); *United States v. Vazquez*, 605 F.2d 1269, 1271 & n. 2 (2d Cir.1979), *cert. denied*, 444 U.S. 981, 1019, 100 S.Ct. 484, 62 L.Ed.2d 408, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980), or indicted the defendant on three or more of the eligible predicate felonies in addition to the § 848 count but ultimately obtained convictions on two or less of them, *e.g.*, *United States v. Barnes*, 604 F.2d 121, 130–31, 167 (2d Cir.1979), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980); *United States v. Sperling*, 506 F.2d 1323, 1328, 1345 (2d Cir.1974) (*Sperling I*), *cert. denied*, 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439, 421 U.S. 949, 95 S.Ct. 1682, 44 L.Ed.2d 103 (1975). Further, "some courts have apparently allowed proof of an overt act in violation of the drug laws to suffice [as a "violation"], even though it was not the basis for a separate substantive count." *United States v. Michel*, 588 F.2d at 1000 n. 15 (citing cases). Moreover, in *Sperling I*, 506 F.2d at 1344, this court stated that an indictment charging a violation of § 848 need not "specify each violation constituting the continuing series of violations proscribed by the statute." In light of this language, Myers has conceded (but only for purposes of his appeal to this court) that in order to support a § 848 charge, the government is not required to plead in any form, much less obtain convictions on, any of the eligible predicate offenses, but may instead simply prove at trial the continuing series of offenses.

■ As to the next requirement of the statute, that the continuing series of violations be undertaken by the defendant in concert with five or more other persons whom the defendant supervises, it is sufficient to note that the government need not establish that the defendant acted in concert with each of the other five persons at the same time. *E.g.*, *United States v. Mannino*, 635 F.2d 110, 116 (2d Cir.1980); *United States v. Barnes*, 604 F.2d at 157.

Finally, the government must demonstrate that the defendant obtained "substantial income or resources" from the "continuing series of violations" referred to in § 848(b)(2). *See United States v. Dickey,* 736 F.2d 571, 588 (10th Cir.1984); *see also United States v. Graziano,* 710 F.2d at 697–99.

### 2. *The Instant Indictment and Jury Charge.*

To understand how the continuing criminal enterprise charged in count two of the indictment was tried to the jury, it is first necessary to focus on the § 846 conspiracy charged in count one, which alleged that Myers conspired with his co-defendants and others to possess and to distribute heroin. It then alleged 17 overt acts, the last of which consisted of a series of 15 telephone calls made "in order to facilitate the distribution of heroin, or possession of heroin with intent to distribute or conspiracy to distribute heroin and to possess heroin with intent to distribute it."

Building on count one, and tracking the language of § 848, count two of the indictment charged Myers with:

* * * engag[ing] in a continuing criminal enterprise in that he committed violations of Subchapter I of Chapter 13, Title 21, United States Code, including the violations alleged in count one of this Indictment, all of which count is incorporated by reference herein, as well as other violations of said statutes, all of which violations were part of a continuing series of violations of said statutes undertaken by FREDDIE MYERS in concert with at least five other persons with respect to whom FREDDIE MYERS occupied the position of organizer, supervisor and manager and from which continuing series of violations FREDDIE MYERS obtained substantial income and resources.

In his charge to the jury, Judge Sand initially stated that in order to convict Myers on count two, the government had to prove "three or more violations of the federal narcotics laws, and that such viola-tions were related acts committed over a period of time." However, at the request of Myers's attorney and consistent with the two-tier approach of *United States v. Lurz,* 666 F.2d 69, and the structure of the indictment, Judge Sand also instructed the jury that one of those three or more violations *had to be* the § 846 conspiracy charged in count one. The court thus charged the jury—over the government's objection—that it could not consider count two unless and until it found Myers guilty of the conspiracy count.

With respect to the other potential predicate offenses, Judge Sand instructed the jury it could find that "on January 14, 1983 [the day of the Flash Inn incident], defendant Myers was guilty of *two* crimes, first, of possessing heroin with intent to distribute it, and second, the crime of actually distributing heroin." (emphasis added). The judge also instructed the jury it could find that Myers was guilty of seven violations of the federal narcotics law prohibiting the use of the telephone in committing, causing, or facilitating narcotics offenses, 21 U.S.C. § 843(b), as a result of his participation in seven of the telephone conversations listed under the last overt act in count one of the indictment.

### 3. *Section 846 as a Predicate Offense for § 848.*

Against this backdrop, we turn to Myers's main argument that the § 846 conspiracy charged in count one was improperly used as a predicate for the § 848 continuing criminal enterprise charged in count two. Emphasizing that the same essential facts supported both counts, Myers submits that the conspiracy charged in count one was a lesser included offense of the continuing criminal enterprise charged in count two, and, as such, was ineligible as a predicate. Put another way, Myers contends that since a narcotics conspiracy must always be proved to satisfy the "in concert" requirement of § 848(b)(2)(A), the same conspiracy cannot also be used as the felony violation required by § 848(b)(1). To allow the same

conspiracy to satisfy both of these statutory elements would, in Myers's view, "collapse them into a single element, in complete derrogation of the Congressional scheme." Myers's brief at 21.

The government, on the other hand, disputes both Myers's premise that a § 846 conspiracy is a lesser included offense within § 848, and his conclusion that such a lesser included conspiracy may not be used as a predicate offense of a continuing criminal enterprise. According to the government, § 848 means exactly what it says: *any* felony violation of Subchapter I or II of Chapter 13 of Title 21 may serve as a predicate violation under § 848; the statute does not say any felony violation except a lesser included § 846 conspiracy.

While the precise issue raised by Myers has not heretofore been the subject of extensive consideration in the courts, several circuits have briefly touched on the question. In *United States v. Lurz*, 666 F.2d at 76, the fourth circuit stated, without any explanation, that "[o]ne may not first prove a conspiracy to distribute to establish a § 846 violation, and then move on to convict under § 848 as well, by using the very same conspiracy to distribute for the felony violation of the federal narcotics laws [required by § 848(b)(1) ]." Nevertheless, the court in *Lurz* went on to hold that a second § 846 conspiracy, upon which a conviction had already been obtained, which was also "altogether distinct" from the § 846 violation that the government used to satisfy § 848(b)(1), could be used to satisfy all of the "other elements" set forth in § 848(b)(2). *Id.* at 76–77.

More recently, in *United States v. Jefferson*, 714 F.2d 689, 702 (7th Cir.1983), the seventh circuit noted "that § 846 stands in a different posture with respect to § 848 than do the substantive offense provisions of the Act". The court elaborated in a footnote, citing *Lurz*, that "the substantive offenses may serve as predicate offenses for a conviction under § 848, while a conspiracy offense under § 846 may not." *Id.* n. 27.

In contrast, in *United States v. Middleton*, 673 F.2d 31 (1st Cir.1982), the first circuit, per Judge Timbers, remarked that "[e]ither possession of marijuana with intent to distribute it, 21 U.S.C. § 841(a)(1) (1976), or conspiracy to possess with intent to distribute it, *id.*, § 846, may serve as the predicate offense." *Id.* at 33. However, that court was concerned with the issue of successive prosecutions under the double jeopardy clause and had no need to address the precise issue presently before us.

Finally, in *United States v. Raffone*, 693 F.2d 1343, 1349 n. 12 (11th Cir.1982), the eleventh circuit merely observed that "[w]hile the former Fifth Circuit never took a position on whether or not a conspiracy under 21 U.S.C. § 846 can be a predicate offense under § 848, see *United States v. Michel*, 588 F.2d 986, 1001 (5th Cir.1979), *cert. denied*, 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979), at least one Circuit Court of Appeals has said that it can. *See United States v. Middleton*, 673 F.2d 31, 33 (1st Cir.1982)."

While there is thus a paucity of reasoned authority directly on point, the relationship between § 846 and § 848 has been more thoroughly explored in the somewhat analogous context of multiple punishments under the double jeopardy clause. In *United States v. Sperling*, 560 F.2d 1050 (2d Cir. 1977) (*Sperling II*), this court held that cumulative sentences could not be imposed on a defendant convicted of violating both § 846 and § 848 where the convictions were based on the same underlying facts. The court in *Sperling II* rested its decision on two related grounds. *See United States v. Martinez-Torres*, 556 F.Supp. 1255, 1260–67 (S.D.N.Y.1983), *aff'd* 722 F.2d 1019 (2d Cir.1983). First, it reasoned that

* * * on the facts here involved, § 846 defines a lesser included offense within § 848. One of the elements required to convict of a § 848 offense is that the defendant shall have violated the narcotics laws "in concert with five or more other persons." "Concerted" means "mutually contrived or agreed on," or

"performed in unison." *Webster's New Collegiate Dictionary*, 233 (1976 ed.). We think it is too plain for cavil that to act "in concert" to violate the law necessarily includes conspiring to do so, and, hence, to prove the continuing criminal enterprise charge is to prove the conspiracy. * * * In the present setting, then, these two offenses are "the same in law and in fact."

560 F.2d at 1055 (citations omitted).

Second, after reviewing the relevant legislative history, the *Sperling II* court found "that Congress did not intend §§ 846 and 848 to be offenses separately and simultaneously punishable where the facts on which the violations rest are the same". *Id.* at 1059.

Although the government would have us confine the lesser included offense analysis of *Sperling II* to the cumulative punishment context, we believe it applies with equal force in a case like the one at bar. We are aware, of course, that in *Jeffers v. United States*, 432 U.S. 137, 144 n. 9, 149–50 & n. 15, 153 n. 20, 155, 97 S.Ct. 2207 (1977), which involved issues of both consecutive prosecutions and cumulative punishments under the double jeopardy clause, the Supreme Court "expressly declined to settle 'definitively' the issue as to whether § 846 was a lesser included offense of § 848." *United States v. Mourad*, 729 F.2d 195, 202 (2d Cir.1984); *see United States v. Gomberg*, 715 F.2d at 849–50 & n. 3. Nevertheless, we decline the government's invitation to limit the language of *Sperling II*, which has been followed by numerous courts, *e.g., United States v. Graziano*, 710 F.2d at 699; *United States v. Smith*, 703 F.2d 627, 628 (D.C.Cir.1983); *United States v. Samuelson*, 697 F.2d 255, 259 (8th Cir.1983); *United States v. Smith*, 690 F.2d 748, 750 (9th Cir.1982), *cert. denied*, 460 U.S. 1041, 103 S.Ct. 1435, 75 L.Ed.2d 793 (1983); *United States v. Michel*, 588 F.2d at 1001.

■ As we suggested in *Sperling II*, § 846 is a lesser included offense of § 848 in the purest form: as a matter of statutory definition, § 848 necessarily encompasses § 846. *See generally* Ettinger, *In Search of a Reasoned Approach to the Lesser Included Offense*, 50 Brooklyn L.Rev. 191, 198–203 (1984); *cf. Whalen v. United States*, 445 U.S. 684, 708–09, 100 S.Ct. 1432, 1446–47, 63 L.Ed.2d 715 (1980) (Rehnquist, *J.,* dissenting). Thus, whatever facts may be alleged in any given indictment, there can never be a § 848 violation without a violation of § 846, although as the *Lurz* case illustrates, not every § 846 conspiracy entered into by a § 848 defendant is necessarily included within the § 848 charge.

Our reaffirmance here of *Sperling II*, however, does not compel the conclusion that the lesser included § 846 conspiracy charged against Myers in count one was ineligible as a predicate for the § 848 continuing criminal enterprise charged in count two. To begin with, the statutory language is unambiguous. Section 848(a)(1) provides that *any* felony violation of Subchapters I and II of Chapter 13 of Title 21 is an eligible predicate, and nothing in the text of either § 848 or § 846 suggests that although a § 846 conspiracy is such a felony it does not qualify as a predicate for a § 848 charge. The reference in § 848 to "any" felony violation of the narcotics laws does not mean "any felony violation except a § 846 conspiracy".

In an analogous context under the Racketeer Influenced and Corrupt Organizations Act (RICO) we refused to exclude illegitimate enterprises from the expression "any enterprise" found in 18 U.S.C. § 1962. We found the word "any" to be "clear, precise and unambiguous," and we noted that "Congress could, if it intended any other meaning, have inserted a single word of restriction." *United States v. Altese*, 542 F.2d 104, 106 (2d Cir.1976), *cert. denied*, 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977); *accord United States v. Turkette, supra*, 452 U.S. at 581, 101 S.Ct. at 2527 ("[h]ad Congress not intended to reach criminal associations [under RICO], it could easily have narrowed the sweep of the definition by inserting a single word, 'legitimate.'"). Similarly here,

had congress intended to exclude § 846 violations from the list of permissible predicates for a continuing criminal enterprise, it could have inserted limiting language in § 848. We are therefore obliged to follow this plain statutory language "in the absence of 'a clearly expressed legislative intent to the contrary'". *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981) (quoting *Consumer Product Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)).

As we read the history of § 848, there is no indication whatsoever, much less a "clear expression", of any such contrary legislative intent. The house report, for example, echoes the statutory language, construing § 848(b)(1) as requiring proof of a violation of "any provision * * * which is punishable as a felony". H.Rep. No. 1444, 91st Cong., 2d Sess., *reprinted in* [1970] U.S.Code Cong. & Ad.News 4566, 4618. While it may well be that congress never specifically considered whether lesser included § 846 conspiracies should be eligible as § 848 predicates, it has provided us with no specific direction that they should not.

Further, there is no reason to believe that allowing a lesser included § 846 conspiracy to serve as a § 848 predicate is at odds with the general congressional intent underlying § 848. Described by some courts as the "King Pin" statute, *see United States v. Johnson*, 575 F.2d 1347, 1358 (5th Cir.1978) (citing cases), *cert. denied*, 440 U.S. 907, 99 S.Ct. 1214, 59 L.Ed.2d 454 (1979), section 848 was aimed at "the business of trafficking in the prohibited drugs on a continuing, serious, widespread, supervisory and substantial basis." *United States v. Manfredi*, 488 F.2d 588, 602–03 (2d Cir.1973), *cert. denied*, 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974). In our view, a "continuing series" of violations consisting of a § 846 offense and two of the other designated offenses is a sufficiently serious matter to trigger these congressional concerns. Further, before a defendant charged with such a series may receive the severe penalties provided for in § 848, the government must also establish that he was manager or supervisor of five other people and that he accumulated substantial resources from his narcotics dealings.

We are unpersuaded by Myers's argument that permitting a lesser included § 846 conspiracy to serve as a § 848 predicate "collapses" the statutory elements. His view makes sense only if one treats the felony violation required by § 848(a)(1) and the continuing series of violations required by § 848(a)(2) as separate elements. In actuality, however, these elements overlap, since the (a)(1) felony violation must be part and parcel of the (a)(2) continuing series. The overlap may take on an added dimension when a § 846 conspiracy is used as one of the predicate felonies, but the fact that the entire series must be carried out "in concert" is no reason to prevent a § 846 violation from qualifying as one of the series.

Moreover, even if the (a)(1) felony and the (a)(2) continuing series are viewed as separate elements, Myers's argument is still unavailing in light of our decision in *United States v. Mazzei*, 700 F.2d 85 (2d Cir.), *cert. denied*, 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983). In *Mazzei*, a RICO case, we held that while the government was required to prove, as two distinct elements of RICO, the existence of both an "enterprise" and a "pattern of racketeering activity", it was not necessary "that proof of these separate elements be distinct and independent, as long as the proof offered is sufficient to satisfy both elements." *Id.* at 89. *See also United States v. Turkette*, 452 U.S. at 583, 101 S.Ct. at 2528 ("the proof used to establish these separate elements may in particular cases coalesce").

■ The same rule applies here. In the absence of any indication that congress intended to impose the unusual requirement that each element of a compound offense like § 848 should be satisfied by distinct and independent proof, we are unwilling to read such a limitation into the statute. We therefore hold that a lesser included § 846 conspiracy may serve as a predicate of-

fense for a § 848 continuing criminal enterprise.

▮ The only remaining issue involving the relationship between these statutes is Myers's claim that there was "plain error" because the court failed to give what he refers to as the "typical" lesser included offense charge, *i.e.*, that the jury should first consider the greater offense, and only if the defendant is found not guilty of that offense should the jury consider the lesser included offense. As previously noted, Judge Sand charged the jury precisely the opposite, *i.e.*, that it should not even consider the § 848 count unless it first found Myers guilty on the § 846 count. Myers cannot now complain of this charge, however, because he requested it, and not even the plain error doctrine permits reversal on the ground that the trial court granted a defendant's request to charge. "We have been especially reluctant to reverse for plain error when it is 'invited.'" *United States v. Mangieri*, 694 F.2d 1270, 1280 (D.C.Cir.1982). "Appellant not only failed to raise any objection to the court's charge, but it is clear that his retained trial counsel specifically requested and urged the trial court to give the instruction now objected to. In such circumstances we decline to find error, plain or otherwise." *United States v. Thurman*, 417 F.2d 752, 753 (D.C. Cir.1969), *cert. denied*, 397 U.S. 1026, 90 S.Ct. 1269, 25 L.Ed.2d 535 (1970). *See also Dennis v. United States*, 341 U.S. 494, 500 n. 2, 71 S.Ct. 857, 862 n. 2, 95 L.Ed. 1137 ("petitioners themselves requested a charge similar to the one given, and under Rule 30 of the Federal Rules of Criminal Procedure, 18 U.S.C.A., would appear to be barred from raising this point on appeal"), *reh'g denied*, 342 U.S. 842, 72 S.Ct. 20, 96 L.Ed. 636 (1951), *reh'g denied*, 355 U.S. 936, 78 S.Ct. 409, 2 L.Ed.2d 419 (1958); *United States v. Wiggins*, 530 F.2d 1018, 1020 (D.C.Cir.1976) ("an invited error generally does not require reversal, *i.e.*, appellant cannot now complain that the court gave an instruction which he requested"); *Petschl v. United States*, 369 F.2d 769, 774 (8th Cir.1966) ("A party is in no position to challenge the giving of an instruction which he has requested"); *Bianchi v. United States*, 219 F.2d 182, 194 (8th Cir. 1955) ("The defendants are not in a position to object to an instruction given at their request").

### 4. *The Predicate Acts Arising Out of the Flash Inn Incident.*

Myers next argues that Judge Sand erred in permitting the jury to consider evidence of the Flash Inn incident as predicate offenses on count two. Myers contends that the government's proof "did not even come close to establishing beyond a reasonable doubt that Myers was involved in a substantive heroin transaction on January 14th". Myers's brief at 29. Further, Myers contends that Judge Sand erred in charging the jury that proof of the single Flash Inn incident could be considered as two separate offenses—possession of heroin with intent to distribute it and distribution of heroin.

By way of background to these arguments, in connection with his Rule 29 motion Myers argued that both counts of the indictment should have been dismissed primarily because there was no evidence that the various packages and envelopes that defendants were seen carrying contained heroin, as opposed to "counterfeit money", "stolen bonds", "cocaine", "Quaaludes, marijuana, [or] the multitude of narcotic drugs that seem to pop up from year to year."

During the trial Judge Sand distributed a draft charge adopting the government's argument that the jury could find a "series" of offenses composed of the conspiracy charged in count one, telephone calls made in furtherance of that conspiracy, and two substantive offenses based on the Flash Inn incident. Myers's trial counsel objected to this portion of the proposed charge in the following manner:

> Before we go any further, can I suggest something at this point: It was made with some degree of precision at the Rule 29 motion but in the context of the charge to the jury, we would object to

the inclusion of any descriptive language which permits the jury to determine guilt on Count 2 based upon their finding that a crime was committed, which is not charged in the indictment, which is, of course, what we are going over right now, in other words, the government's assertion in the charge of definitions of crimes which are not set forth in the indictment. So that what we are saying really, two things would work, one is that the indictment is insufficient on its face, No. 2—actually, three things—No. 2, even if the indictment is sufficient, that the government has failed substantively to prove the charges, and No. 3, that they cannot, can't be included in the charge to the jury. So that the jury should not be permitted at this juncture to determine whether a substantive crime is committed where that substantive crime has not been charged in the indictment.

Judge Sand responded:

I really think that is not an objection to the charge, but is an aspect of the Rule 29 motion.

In any event, I don't accept it as a correct statement of the law, and the objection predicated on that is overruled.

With this background in mind, we turn to Myers's argument that Judge Sand erred in submitting the Flash Inn incident to the jury. We address first his claim that the evidence was insufficient to establish that he was involved in a heroin transaction at the Flash Inn. This claim was preserved for appeal by Myers's objection, quoted above, "that the government has failed substantively to prove the charges".

█ In our view, there was ample circumstantial evidence to enable the jury to rationally determine beyond a reasonable doubt that Myers was involved in a heroin transaction during the Flash Inn incident. As previously noted, the Flash Inn meeting was arranged in a telephone call from Myers's house. Myers participated in making those arrangements, himself suggesting a location for the meeting. The guarded nature of the conversation, the unusual manner in which Myers and the others behaved at the Flash Inn, and the surreptitious fashion in which one bag was taken from Myers's Mercedes-Benz and another was transferred to the trunk of the Lincoln were all factors from which the jury was entitled to infer that the transaction at the Flash Inn was a narcotics transaction. *See United States v. Fiotto*, 454 F.2d 252, 254 (2d Cir.), *cert. denied*, 406 U.S. 918, 92 S.Ct. 1769, 32 L.Ed.2d 117 (1972) ("clandestine character of the actions of those involved" and "the conversation of the participants" are relevant circumstances in determining whether transaction was narcotics-related).

Moreover, as discussed more fully *infra*, the jury could also rely on the expert testimony of Detective Magaletti, based on his observations and his extensive experience, that Myers was distributing narcotics at the Flash Inn meeting. Contrary to Myers's contention, therefore, it was not necessary that any of the participants in the episode be stopped, searched, or identified as narcotics traffickers, or that either of the two different men's handbags seen that evening, be seized.

Myers's second argument with respect to the Flash Inn incident presents a different problem. He argues that Judge Sand improperly charged the jury that it could find *two* separate narcotics offenses based on the Flash Inn incident: possession of heroin with intent to distribute it, and actual distribution of heroin. According to Myers, the proof gave rise to at most *one* offense.

This court has yet to decide whether the offense of possession of narcotics with intent to distribute, proscribed by 21 U.S.C. § 841(a)(1), merges with the offense of actual distribution of the same narcotics, proscribed by the same section. *See United States v. Beverly*, 562 F.2d 201, 204 (2d Cir.1977), *cert. denied*, 434 U.S. 1039, 98 S.Ct. 779, 54 L.Ed.2d 789 (1979); *United States v. Vasquez*, 468 F.2d 565, 566–67 (2d Cir.1972), *cert. denied*, 410 U.S. 945, 93 S.Ct. 1400, 35 L.Ed.2d 612 (1973). However, the weight of authority elsewhere is

that a defendant may be convicted of both possession of narcotics with intent to distribute and distribution of the same narcotics, provided that there is some evidence of possession apart from the actual distribution. *United States v. Gonzalez*, 715 F.2d 1411, 1412 (9th Cir.1983); *United States v. Berkowitz*, 662 F.2d 1127, 1141–42 (5th Cir. 1981); *United States v. Foundas*, 610 F.2d 298 (5th Cir.), *modified on other grounds*, 615 F.2d 1130 (5th Cir.1980); *see United States v. Carter*, 576 F.2d 1061, 1064 (3rd Cir.1978); *United States v. Costello*, 483 F.2d 1366, 1368 (5th Cir.1973); *United States v. Gaertner*, 432 F.Supp. 805, 807 (E.D.Wis.1977); *cf. United States v. Hernandez*, 591 F.2d 1019, 1022, 5th Cir.1979; *United States v. Curry*, 512 F.2d 1299, 1305–06 (4th Cir.), *cert. denied*, 432 U.S. 832, 96 S.Ct. 55, 46 L.Ed.2d 50 (1975). *But cf. United States v. Nichols*, 401 F.Supp. 1377, 1378–83 (E.D.Mich.1975).

Were we forced to resolve this issue today in the context of this case, a close question would be presented, for even under the prevailing view, it is debatable whether there was sufficient evidence against Myers apart from the actual distribution to support a conviction for possession with intent to distribute as well as one for actual distribution. However, we need not reach this issue, since in our view, Myers failed to preserve it for appellate review.

Myers's objected to the jury charge, stating "that the government has failed substantively to prove the charges". When read in context and in connection with his earlier Rule 29 motion, this one-line objection was not sufficient to alert the trial judge to the claim that Myers now raises for the first time. It was directed, instead, at the failure of the government to establish by direct evidence that heroin was involved in the case in general or in the Flash Inn incident in particular, and it thus reflected Myers's view that *no* substantive crime occurred during the Flash Inn incident. The objection cannot fairly be construed as encompassing Myers's present claim that the Flash Inn incident gave rise to, at most, one heroin offense.

Despite the government's fears, *see* Government's brief at 46 *, we do not believe that our recent decision in *United States v. Ruggiero*, 726 F.2d 913 (2d Cir. 1984), permits Myers to raise this claim for the first time here. In *Ruggiero*, a criminal RICO case, we held that a defendant could object for the first time on appeal to the inclusion in an indictment and submission to the jury of a purported predicate offense that was not within the statutorily defined range of eligible predicate offenses. In other words, the alleged crime in *Ruggiero*, at least to the extent it incorporated a "predicate offense" that could not serve as a predicate offense, was legally insufficient. In effect, we held there that a defendant could not waive his right to object to being charged and convicted of a crime that simply did not exist.

■ The situation in the case at bar is significantly different. Myers has conceded that possession with intent to distribute and actual distribution generally may serve as predicates for a § 848 continuing criminal enterprise; consequently, Myers's claim is not directed at the legal sufficiency of the charge. Instead, he claims that there was insufficient evidence brought out at trial to properly convict him of both possession with intent to distribute and actual distribution. Having failed to alert the trial court to the specific claim of insufficiency of the evidence that he seeks to advance here, Myers must be deemed to have waived his right to appellate review of the issue. *United States v. Natelli*, 527 F.2d 311, 328–30 (2d Cir.1975), *cert. denied*, 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976); *United States v. Cunningham*, 723 F.2d 217 (2d Cir.1983); *United States v. Mowad*, 641 F.2d 1067 (2d Cir.), *cert. denied*, 454 U.S. 817, 102 S.Ct. 94, 70 L.Ed.2d 86 (1981).

5. *The "Telephone Use" Violations as Predicate Offenses.*

Myers also argues that he was improperly convicted under § 848 because of the use of uncharged violations of 21 U.S.C.

§ 843(b) as potential predicates. Section 843(b) provides, in pertinent part, that

> [it] shall be unlawful for any person knowingly or intentionally to use any communication facility in committing or causing or facilitating the commission of any act or acts constituting a felony under any provision of [the federal narcotics laws].

Myers contends both that violations of this statute may never serve as predicates underlying a § 848 charge, and that there was insufficient evidence as to several of the telephone calls that were submitted to the jury as potential predicates.

The district judge submitted to the jury seven of the fifteen telephone calls listed under the last overt act in count one as possible predicates for the count two continuing criminal enterprise. Tapes of each of these calls had earlier been played for the jury. The judge told the jury that each use of the telephone could be considered a violation of § 843(b) if done knowingly and intentionally and if the purpose of the call was to facilitate a violation of the narcotics laws, including a conspiracy to distribute heroin.

■ We have little difficulty rejecting Myers's contention that violations of § 843(b) may never serve as § 848 predicates. To begin with, as previously noted, § 848 explicitly provides that *any* violation of Subchapters I or II of Chapter 13 of Title 21 is an eligible predicate offense, and § 843(b) falls within this range. Moreover, we are not persuaded by Myers's claim that allowing § 843(b) telephone offenses to be considered as part of a "continuing series of violations" pursuant to the plain language of § 848 would in any way trivialize the statute. In our view, the other elements of the statute—action "in concert with five or more persons", proof of defendant's position as a supervisor, manager, or organizer, and "substantial income or resources"—are adequate to insure that § 848 remains a tool designed for prosecuting "professional criminals", 116 Cong.Rec. 1181 (1970) (remarks of Sen. Thurmond), involved in "major trafficking in drugs",

*id.* at 996 (remarks of Sen. Dodd), rather than a class of less culpable telephone violators. We therefore agree with the fourth circuit that "telephone-use counts * * * do lie within § 848." *United States v. Webster*, 639 F.2d 174, 181 (4th Cir.), *cert. denied*, 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981), *modified on other grounds*, 669 F.2d 185 (4th Cir.), *cert. denied*, 456 U.S. 935, 102 S.Ct. 1991, 72 L.Ed.2d 455 (1982).

■ Myers's sufficiency of evidence claim is equally deficient. Of the seven telephone calls submitted to the jury as potential predicate violations, Myers claims that three were not supported by sufficient evidence to show they were made to facilitate a narcotics violation. He does not, nor could he on this record, challenge the sufficiency of the evidence on the other four telephone violations, which when considered with the § 846 conspiracy and the Flash Inn violation were more than enough to support the jury's implicit finding of a "continuing series" of narcotics violations.

■ Nor can Myers now succeed simply because there were included along with the sufficiently supported predicate violations others that may have lacked sufficient evidence to qualify them as part of the "series". If Myers wished at trial to prevent specific telephone calls from being submitted to the jury as potential predicates, he was required to move to withdraw from the jury's consideration those predicates claimed to have insufficient evidentiary support. Having failed to do so, Myers is barred on appeal from claiming that the jury might have based its finding of a continuing series of violations on one or more of those three calls. *United States v. Natelli*, 527 F.2d 311, 329 (2d Cir.1975), *cert. denied*, 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976).

### 6. *Summary as to Myers on Count Two.*

We hold that the lesser included § 846 conspiracy charged against Myers in count one was properly used as a predicate for

the § 848 continuing criminal enterprise offense charged in count two, and that having requested it Myers is now precluded from complaining of the lesser included offense charge. We also hold that the evidence was sufficient to show that Myers committed at least one narcotics violation during the Flash Inn incident, and that Myers waived his right to argue on appeal that the evidence was insufficient to show two. Finally, Myers is precluded from challenging the sufficiency of the evidence on the § 843(b) telephone violations that were submitted to the jury as potential § 848 predicates. Myers's conviction on count two is therefore affirmed.

B. *Validity of the Search of Tangee Afflic's Apartment.*

We next consider whether the search of Tangee Afflic's apartment at 1600 Sedgwick Avenue in the Bronx was supported by probable cause. The search was conducted pursuant to an oral search warrant issued over the telephone by Magistrate Buchwald. *See* Fed.R.Crim.P. 41(c)(2). The warrant, in turn, was based on a written affidavit sworn to by agent Garrett, supplemented by an oral affidavit in which Garrett informed the magistrate, also over the telephone, that a trained police dog, named Kane, had signalled the presence of heroin at Tangee's apartment. The signal proved to be erroneous, however, when no heroin or other narcotics were found.

The crux of Tangee's argument is that "[t]he mere nod of a dog's head cannot furnish probable cause to invade the sanctity of a home". Tangee Afflic's Brief at 6. Tangee places great weight on the fact that in this case Kane, who was described by Judge Oakes in *United States v. Waltzer,* 682 F.2d 370, 374 (2nd Cir.1982) (concurring opinion), *cert. denied,* — U.S. ——, 103 S.Ct. 3543, 77 L.Ed.2d 1392 (1983) as "the able, canny canine, Kane, with the perfect record—all hits and no misses", was "barking up the wrong tree". Tangee Afflic's Brief at 14. This only illustrates, in Tangee's view, that dog sniffs of homes, which lack approving precedent in this or

any other court, are far less reliable than dog sniffs of luggage or storage lockers, which have frequently been upheld. *E.g., United States v. Waltzer,* 682 F.2d at 374; *United States v. Johnson,* 660 F.2d 21 (2nd Cir.1981); *United States v. Bronstein,* 521 F.2d 459 (2nd Cir.1975), *cert. denied,* 424 U.S. 918, 96 S.Ct. 1121, 47 L.Ed.2d 324 (1976); *United States v. Venema,* 563 F.2d 1003 (10th Cir.1977).

Because of the apparent physical differences between a dog's sniff in a small confined area and a dog's sniff at the entrance of an apartment or home, Tangee Afflic argues that in order for a search warrant based on the sniff of an apartment to be valid, the supporting affidavit must provide a detailed account of the searching dog's track record with respect to apartments and homes. According to Tangee, the track record supplied in agent Garrett's written affidavit was insufficient, since it only indicated that Kane was successful in two similar incidents without indicating how many times he had failed.

■ Were the search of Tangee's apartment based, as she suggests, "on the mere nod of a dog's head", we might be inclined to agree with her argument. Given the details in agent Garrett's written affidavit, however, it is apparent that the search was based on far more than Kane's mistaken signal, and was fully supported by probable cause even without the dog's erroneous signal.

Agent Garrett's written affidavit began by explaining at some length how and what he had learned of Myers and Alliebe Afflic's alleged heroin dealings from three independent, confidential sources whose reliability had been established in prior cases. Garrett stated that he had learned from "Source A", who had known Myers personally for at least 15 years, that Young "served as Myers's body guard accompanying Myers whenever Myers transacts his narcotics business." Garrett also stated that he had learned from "Source B", who personally knew Myers and Young, "that Steven Young lives in an apartment at 1600 Sedgwick Avenue, Bronx, New York."

Garrett then set forth details about surveillances relating to possible narcotics distribution activity by Alliebe, Tangee, and Valerie Afflic, as well as Young. Specifically, he recounted that agents had seen:

(a) Alliebe Afflic drive from her home in Mount Vernon, New York, to 1600 Sedgwick Avenue, Bronx, New York and transfer packages (often in white plastic bags) to and from her daughter Valerie Afflic, or another daughter, Tangee Afflic, in the lobby of that building or outside that building. * * *

(b) Steven Young, a/k/ "Train," deliver packages to 102 West 119th Street, New York, New York, a building about which, according to records of the New York Police Department, there were complaints in 1982 of narcotics-related activity. * * *

Garrett next stated that he had learned from one Sergeant Young, a security officer at 1600 Sedgwick Avenue, that:

(a) Valerie Afflic and Tangee Afflic have each lived at 1600 Sedgwick Avenue for approximately two years. Valerie Afflic lives in Apartment 9B; Tangee Afflic lives with Steven Young, a/k/a "Train," in Apartment 7A.

(b) At least once a week, and sometimes more often, he has seen Alliebe Afflic, the mother of Valerie Afflic and Tangee Afflic, drive to 1600 Sedgwick Avenue in a blue four-door Mercedes-Benz. On these occasions, she has always brought a package, usually a large shopping bag with groceries on top, to the building, and has always given the package to either Valerie Afflic or Tangee Afflic. According to Sergeant Young, Alliebe Afflic was most recently at 1600 Sedgwick Avenue on Monday, February 21, 1983, when she gave a package to Tangee Afflic and a woman known as "Mousy," who lives in Apartment 19B.

(c) During the last several months, Steven Young often has frequently brought an attache case or suitcase into 1600 Sedgwick Avenue, usually on Fridays.

(d) Approximately two or three weeks ago, Sergeant Young saw Bruce Walker, who lives in Apartment 9S, leave Valerie Afflic's apartment, Apartment 9B, carrying a white plastic shopping bag with groceries on top, similar in appearance to the bags carried to the building by Alliebe Afflic (*see* § 9(b), above). Walker has been seen by Sergeant Young distributing drugs in the lobby of 1600 Sedgwick Avenue and on the street near the building. In addition, continuously ever since September 1982, nearly every day of the week, several young women have arrived at 1600 Sedgwick Avenue in taxicabs and either have been seen going to Apartment 9S or have told the security officer that they are looking for "Bruce"; they generally have left 4 or 5 hours after they arrive.

(e) Apartment 24G at 1600 Sedgwick Avenue is occupied by one Sandra Singleton, who Sergeant Young has seen together with Tangee Afflic and/or Valerie Afflic on numerous occasions, in recent months, talking in a manner which suggested to Sergeant Young that they were friendly with one another. Numerous men have been observed by Young driving up to 1600 Sedgwick Avenue in expensive automobiles and going up to Apartment 24G, sometimes with packages in recent months; they have rarely stayed longer than ten minutes.

Agent Garrett's written affidavit was thus filled with details suggesting that the building at 1600 Sedgwick Avenue was a key component in a vertically integrated heroin distribution network. Four apartments, including Tangee Afflic's, were implicated. While it is true that there was little information specifically linking Tangee Afflic to the narcotics activity, the same cannot be said of her apartment. First, Garrett's affidavit accurately asserted that Young shared Tangee's apartment with her (although it did not mention that he also maintained an apartment of his own at the same address), and there was ample information linking Young to the narcotics activities. Second, given that probable

cause is a "practical, nontechnical conception", *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949), it would be myopic to focus only on Tangee's apartment without taking into account the suspicious activities of the other residents of the building with whom Tangee was associated.

The "totality of the circumstances", *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983)—apart from Kane's signal—provided a sufficiently substantial basis for concluding that a search of Tangee Afflic's apartment would uncover evidence of narcotics-related activity. Consequently, the dog's sniff was unnecessary to establish probable cause, and we see no reason to penalize the law enforcement officers involved in this case, and the public at large, because the agents exercised an overabundance of caution in seeking to verify their already well-founded suspicions through an arguably unreliable, or at least unsubstantiated, technique before obtaining a search warrant from the magistrate.

In view of our conclusion on this issue as well as on the validity of the search of Myers's house, *see infra* Part IIC, we find it unnecessary to determine whether the fruits of the searches were admissible under the newly-defined good faith exception to the exclusionary rule. *See United States v. Leon*, —— U.S. ——, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

### C. *Validity of the Search of Myers's House.*

We next consider Alliebe Afflic's argument that the warrant authorizing the search of Myers's home was not based on probable cause and failed to specify the items to be seized with sufficient particularity. The probable cause prong of this argument presents us with no difficulty whatsoever. Agent Garrett submitted two affidavits in support of the search warrant. The first, which consisted of 20 single spaced pages, recited in great detail facts culled from the developing investigation, which, as Judge Sand found, made it

"clear" that "there existed probable cause to believe that the alleged conspiracy was in existence."

The second, shorter affidavit established that Myers and Afflic lived at 205 Bradley Avenue; noted portions of the longer affidavit that indicated the house was being used to carry out objects of the conspiracy; and recited two telephone calls intercepted by the court-authorized wiretap in which Myers, calling from his office, instructed Alliebe Letecia Myers (another one of Afflic's daughters) to close the door to a safe in his bedroom. Invoking his 13 years of experience, agent Garrett observed in this affidavit that narcotics dealers "often keep the cash proceeds of their narcotics business in such safes" and that "[i]t is also common for narcotics dealers to keep records and other evidence of their business in their homes."

■■■■ When viewed "practically and in a commonsense fashion", *United States v. Travisano*, 724 F.2d 341, 346 (2d Cir. 1983), these two affidavits "set forth a sufficiently suspicious set of overlapping facts", *United States v. Manafzadeh*, 592 F.2d 81, 90 (2d Cir.1979), to support Magistrate Buchwald's issuance, and Judge Sand's approval, of the search warrant. Moreover, contrary to Alliebe Afflic's claim, the magistrate was entitled to credit agent Garrett's specialized knowledge about the practices of narcotics dealers. *See Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983).

The particularity prong of Alliebe Afflic's fourth amendment argument, on the other hand, presents a closer question. The warrant in question authorized the agents to search the entire premises of 205 Bradley Avenue for:

Quantities of heroin and other controlled substances, other chemical substances, equipment, utensils, paraphernalia, containers, money, notes, documents and papers *and other evidence* of a conspiracy to distribute and of the distribution and possession with intent to distribute of [sic] narcotic drug controlled substances * * *. [Emphasis added].

Alliebe Afflic claims that the warrant was an impermissible "general warrant" which "set loose a 'roving commission' to rummage through the entire Myers home and all their possessions." Alliebe Afflic's Brief at 30–31. She emphasizes that the open-ended phrase "other evidence" allowed the agents to seize a variety of items not specifically mentioned in the warrant, such as precious jewelry, fur coats, expensive automobiles, and various photographs.

■ The fourth amendment provides that " * * * no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing* the place to be searched, and the persons or *things to be seized.*" (Emphasis added). This particularity requirement serves three related purposes: preventing general searches, preventing the seizure of objects upon the mistaken assumption that they fall within the magistrate's authorization, and preventing the issuance of warrants without a substantial factual basis. *See generally* 2 W. La Fave, *Search and Seizure: A Treatise on the Fourth Amendment,* § 4.6 (1974 and 1984 Supp.).

With respect to the first two of these purposes, which are directly implicated here, the Supreme Court has stated:

> The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.

*Marron v. United States,* 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927).

Although often cited, this passage from *Marron* has not always been applied literally. *See 2 La Fave, supra,* §§ 4.6, 4.11. Courts tend to tolerate a greater degree of ambiguity where law enforcement agents have done the best that could reasonably be expected under the circumstances, have acquired all the descriptive facts which a reasonable investigation could be expected to cover, and have insured that all those facts were included in the warrant. *Id.,*

§ 4.6 at 98; *see Andresen v. Maryland,* 427 U.S. 463, 478–82, 96 S.Ct. 2737, 2747–49, 49 L.Ed.2d 627 (1976); *United States v. Wuagneux,* 683 F.2d 1343, 1348–51 (11th Cir.1982), *cert. denied,* —— U.S. ——, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983); *United States v. Dennis,* 625 F.2d 782, 792 (8th Cir.1980); *United States v. Davis,* 589 F.2d 904, 906 (5th Cir.), *cert. denied,* 441 U.S. 950, 99 S.Ct. 2178, 60 L.Ed.2d 1055 (1979). *But see United States v. Cardwell,* 680 F.2d 75, 77–78 (9th Cir.1982); *United States v. Abrams,* 615 F.2d 541 (1st Cir. 1980); *Application of Lafayette Academy, Inc.,* 610 F.2d 1, 3–6 (1st Cir.1979).

Along these lines, in *United States v. Dunloy,* 584 F.2d 6, 10–11 (2d Cir.1978), this court upheld a search warrant that was worded almost identically to the one at issue here. In ruling that the warrant was not impermissibly broad, Judge Mansfield's opinion for the court emphasized "the inability under the circumstances to provide a more precise description of the criminal instrumentalities that would be found * * * ". *Id.* at 10. Similarly here, the agents did all that could reasonably have been expected in drawing up the warrant.

It is true, as Alliebe Afflic points out, that the search of the safe deposit box in *Dunloy* was more limited in scope than the search of Myers's house. However, we do not believe that the scope of the search in the instant case compels a different conclusion, particularly where there was probable cause to believe that the items listed in the warrant could be found in any part of Myers's house.

■ Further, the boilerplate language challenged by Alliebe Afflic, like the language that appeared in the *Dunloy* warrant, followed a list of more specific items to be seized, and could be construed only in conjunction with that list. *See United States v. Mankani,* 738 F.2d 538 at 546 (2d Cir.1984) ("Because of [the warrant's] specificity, we cannot find that it was overbroad"). Under this approach the use of the term "other evidence" following the term "money" was sufficient to permit the

agents to seize such manifestations of wealth as furs, jewelry, and expensive automobiles. It may not have been sufficient to permit them to seize the photographs, but we need not consider this question, since the admission of the photographs into evidence was cumulative and, at most, harmless error.

### D. *The Government's Use of Expert Testimony.*

Alliebe Afflic also claims she was denied a fair trial as a result of the government's "widespread" use of expert testimony by agents involved in the investigation. Specifically, she challenges (1) agent Magno's testimony about heroin "mills" in general and Anderson's apartment in particular; (2) officer Wall's testimony that people in front of a building entered by a man who had received a package from Alliebe Afflic were waiting to purchase drugs; (3) officer Hight's narration of the "red door" videotape and his testimony that that location was a narcotics "shooting gallery"; and (4) detective Magaletti's testimony that a narcotics transaction was taking place during the Flash Inn incident.

Fed.R.Evid. 702 provides:

If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In applying this rule, the "trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous." *United States v. Carson,* 702 F.2d 351, 369 (2d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 2456, 2457, 77 L.Ed.2d 1335 (1983) (quoting 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 702[02] (1981)).

■■■ Given our limited scope of review, we must reject Alliebe Afflic's challenges to the opinion testimony of officer Wall and detective Magaletti. The qualifications under Rule 702 of neither are questioned, and

each offered his opinion as to the nature of events that he had viewed personally. Such opinions are admissible both under Rule 702 as expert opinions and under Rule 701 as lay opinions based on perceived events. Without doubt, the Flash Inn incident was sufficiently unusual for Judge Sand to determine that opinion testimony would be "helpful to * * * the determination of a fact in issue", Rule 701, and "assist the trier of fact to understand the evidence, or to determine a fact in issue". Rule 702.

The same is true, albeit to a lesser extent, with respect to officer Wall's observation of 25 to 30 people milling around outside a building. *See United States v. Carson,* 702 F.2d at 369 (undercover agents who witnessed defendant's activities permitted to testify as experts as to the clandestine manner in which drugs are bought and sold).

■■■ Contrary to Alliebe Afflic's contention, it was not improper for the government to elicit this expert testimony from law enforcement officers who also testified as fact witnesses. *See, e.g., id.; United States v. Bermudez,* 526 F.2d 89, 97–98 (2d Cir.1975), *cert. denied,* 425 U.S. 970, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976); *see also United States v. Borrone-Iglar,* 468 F.2d 419, 420–21 (2d Cir.), *cert. denied,* 410 U.S. 927, 93 S.Ct. 1360, 35 L.Ed.2d 588 (1973). Under all the circumstances, therefore, Judge Sand did not commit "manifest error" in permitting the opinion testimony of Magaletti and Wall.

Little more need be said to dispose of the challenge to officer Hight's testimony. Like Magaletti and Wall, Hight was unquestionably qualified as an expert. The only difference in his testimony was that he narrated and offered his opinions as the government played for the jury the videotape upon which he based his opinions. We will not second guess Judge Sand's implicit determinations that this technique was helpful in assisting the jury to understand the evidence, and in enabling the jury to

evaluate the basis upon which Hight formed his opinion.

Generally speaking, a trial judge has broad discretion in deciding whether or not to allow narrative testimony. Fed.R.Evid. 611(a); *Hutter Northern Trust v. Door County Chamber of Commerce*, 467 F.2d 1075, 1078 (7th Cir.1972); *see Goings v. United States*, 377 F.2d 753, 762–63 (8th Cir.1967). We see no reason to apply a different rule here, where the narrative testimony accompanied and explained videotaped evidence.

In addition to being unassailable under Rules 701 and 702, Judge Sand's rulings with respect to these three expert witnesses in no way deprived appellants of a fair trial. To the extent that the government's "widespread" reliance on expert testimony was, as various defendants contend, necessary to shore up a weak case, defendants were free to expose those weaknesses through cross-examination and argument; indeed, that is precisely what they tried to do. For example, on cross-examination of detective Magaletti it was brought out that he made no attempt to apprehend the principals during the Flash Inn incident, notwithstanding his previously stated firm belief that a narcotics transaction was unfolding. Moreover, defendants were free to employ experts of their own, and they availed themselves of this opportunity.

The testimony of the fourth government expert, agent Magno, stands on a different footing. As a prologue to his testimony concerning the search at Anderson's apartment, Magno was permitted to testify about his conception of the entire "chain of heroin distribution starting with the overseas points of origin down to the street level". Judge Sand instructed the jury that Magno was "talking about the procedures in general, and not the facts or circumstances of this particular case."

As part of this dissertation, Magno explained the role that heroin "mills" play, and described the types of paraphernalia that one would expect to find at a "mill". At that point, the prosecutor directed Mag-

no's attention to the March 6th search of Anderson's apartment, and Magno testified that he found precisely what he had just said he would expect to find in a "mill".

While the form of this testimony left much to be desired, we believe it was substantively unobjectionable. One of the issues in this case was whether Anderson's apartment was, as the government contended, a heroin "mill", or, as Alliebe Afflic's expert witness suggested, merely an operation from which diluents for narcotics were distributed. Thus, as in *United States v. Pugliese*, 712 F.2d 1574, 1582 (2d Cir.1983), the expert testimony related to "the issues of fact that were properly before the jury."

In addition, to the extent that Magno's testimony concerning the manner in which retail heroin distribution organizations obtain and process raw heroin provided the background for his testimony about the characteristics and operating methods of a heroin "mill", it was not manifest error for Judge Sand to permit it. Unlike the situation in *United States v. Hall*, 653 F.2d 1002 (5th Cir.1981), relied on by Alliebe Afflic, Judge Sand instructed the jury here that the expert's general testimony did not concern "the facts or circumstances of this particular case", and thereby eliminated the risk of any unfair prejudice. Moreover, the testimony here, unlike the testimony challenged in *Hall*, was not used to explain the absence of any corroborating physical evidence in the government's case, but was instead used to explain physical evidence that was in the case.

For these reasons, we find no error in Judge Sand's rulings with respect to the government's expert testimony.

E. *Sufficiency of the Evidence on the Conspiracy Count.*

Each appellant, except Myers, contends that the evidence was insufficient to support his or her conspiracy conviction under count one. While the government's case was far from overwhelming, we believe the evidence was sufficient to support the conspiracy convictions of Young, Ward, Cavi-

ness, and Alliebe Afflic. We do not, however, believe it was sufficient to support the conspiracy conviction of Tangee Afflic.

■■■■ The standards governing appellants' sufficiency claims are well-settled. A defendant challenging the sufficiency of the evidence carries "a very heavy burden". *United States v. Carson*, 702 F.2d at 361; *United States v. Losada*, 674 F.2d 167, 173 (2d Cir.), *cert. denied*, 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982). "The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Further, "pieces of evidence must be viewed not in isolation but in conjunction", *United States v. Carson*, 702 F.2d at 362, and a reviewing court must draw all available inferences, and resolve all issues of credibility, in favor of the jury's verdict. *United States v. Bagaric*, 706 F.2d 42, 64 (2d Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 133, 134, 283, 78 L.Ed.2d 128, 128, 261 (1983).

It is equally well-settled that because "[a] conspiracy by its very nature is a secretive operation", *United States v. Provenzano*, 615 F.2d 37, 45 (2d Cir.), *cert. denied*, 446 U.S. 953, 100 S.Ct. 2921, 64 L.Ed.2d 810, 459 U.S. 858 (1980), and because intent and knowledge are subjective facts, *see United States v. Sheiner*, 410 F.2d 337, 340 (2d Cir.), *cert. denied*, 396 U.S. 825, 859, 90 S.Ct. 68, 127, 24 L.Ed.2d 76, 110 (1969), the "[e]xistence of and participation in a conspiracy with the requisite criminal intent may be established * * * through circumstantial evidence." *United States v. Sanzo*, 673 F.2d 64, 69 (2d Cir.), *cert. denied*, 459 U.S. 858, 103 S.Ct. 128, 74 L.Ed.2d 111 (1982). Indeed, this court has long recognized that "often if not generally, direct proof of a criminal conspiracy is not available and it will be disclosed only by a development and collocation of circumstances." *United States v. Manton*, 107 F.2d 834, 839 (2d Cir.1939), *cert. denied*, 309 U.S. 664, 60 S.Ct. 590, 84 L.Ed. 1012 (1940). In light of these standards, we will consider each claim of insufficient evidence.

### 1. *Lloyd Ward.*

■■■■ Ward contends that the government proved no more than an innocent association among him and his co-defendants. In our view, however, there was ample evidence from which the jury could find that Ward's association with Myers, Caviness, and Anderson was narcotics-related. For example, Ward was ostensibly in the restaurant business and Myers was supposedly in an unrelated record business; nevertheless, in one of the recorded telephone conversations the jury heard Myers acting as though he were Ward's boss. The unnaturally guarded tone of this conversation, in which Myers and Ward were careful not to state expressly what it was that Ward was supposed to, but had failed to, deliver to Myers, supported an inference in the context of all the other evidence that the call concerned a narcotics transaction. *See United States v. Martino*, 664 F.2d 860, 864 n. 3 (2d Cir.1981), *cert. denied*, 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982); *United States v. Sisca*, 503 F.2d 1337, 1343 (2d Cir.), *cert. denied*, 419 U.S. 1008, 95 S.Ct. 142, 328, 42 L.Ed.2d 118, 283 (1974). Ward's employment by Myers in his narcotics business was further suggested by another telephone conversation during which, the jury could infer, Ward removed narcotics from a desk drawer in Myers's office. The jury was also entitled to conclude that Ward's meeting with Caviness immediately after Caviness had made a suspicious pickup of a package from the Ace Barbershop was an act in furtherance of the conspiracy to distribute narcotics.

Beyond this, the proof showed that between 1977 and 1982, Ward had reported a total of only $47,425 from his employment at a restaurant, yet had accumulated substantial wealth. His assets, as of March 6, 1983, included jewelry worth $236,655, a luxurious suburban house, two Mercedes-Benz automobiles, a $41,000 swimming

pool, $67,320 in cash, and furniture worth more than $50,000, ordered for a $975 per month apartment. The accumulation of such a large amount of unexplained and unreported wealth was, in the context of this case, highly probative of Ward's involvement in narcotics trafficking. *See, e.g., United States v. Barnes,* 604 F.2d at 147; *United States v. Viserto,* 596 F.2d 531, 536 (2d Cir.), *cert. denied,* 444 U.S. 841, 100 S.Ct. 80, 62 L.Ed.2d 52 (1979).

### 2. *Charles Caviness.*

▮ There was also ample evidence to support Caviness's conspiracy conviction. Caviness was in possession of an Ohaus triple-beam balance scale as well as two keys which opened the door to Anderson's apartment, which the jury was entitled to find was a heroin mill. Further, Caviness frequently drove Myers to and from his Manhattan office, brought packages to Myers's house late at night, engaged in a circumspect conversation with Myers concerning what the jury could infer was a narcotics deal on 112th Street, and reported to Myers that surveillance agents were following his car. There was also proof that Caviness made a brief trip to the building in which the heroin mill was located. Finally, Caviness's unexplained wealth (a BMW automobile, and jewelry worth more than $17,000), which had accumulated even though he had not reported any income to the Internal Revenue Service for the years 1977–82, could properly be considered by the jury as evidence that he had associated himself with a narcotics conspiracy.

### 3. *Steven Young.*

▮ The jury was also justified in finding that Young was a knowing participant in the conspiracy charged in count one. A search of Young's apartment uncovered an Ohaus triple-beam balance scale similar to the one Caviness possessed, a small quantity of lactose, a chemical frequently used to cut heroin, three holsters, and a large quantity of ammunition. In addition, Young's guilty knowledge was established by proof of his telephone conversation with Myers shortly after Tangee Afflic's apartment was searched. Young's initial reaction to Myers's report that "the Feds" had just searched Tangee's apartment for narcotics, was to speculate as to which of his actions had prompted the search. The evidence further demonstrated that Young had free access to Myers's house, which, at least on March 6, 1983, contained over $1,300,000 in cash and other valuable assets. Moreover, Young accompanied Caviness in bringing packages to Myers's house, often drove evasively, was seen handing a plastic package to Bivens on a Harlem street corner, and also possessed wealth (over $16,000 in jewelry, $2,000 on his person at the time of his arrest, a Cadillac, and a Jeep) for which no legitimate explanation existed.

### 4. *Alliebe Afflic.*

▮ Although Alliebe Afflic's sufficiency claim presents a closer question, we conclude, on balance, that there was sufficient evidence to support her conviction. To begin with, there was evidence that she delivered a package on West 116th Street to a man who immediately brought it into a building where people were awaiting the delivery of heroin. She was also observed while engaging with Bivens on Fifth Avenue in Harlem, in a transaction which, notwithstanding its acquittal of Bivens, the jury was entitled to find was narcotics-related. In addition, she was seen making a trip at night into Manhattan, accompanied by Tangee Afflic, in order to bring a package into Myers's office. These activities, as well as telephone calls in which she furnished information to Myers about surveillances, and the presence of her "Afflic" laundry tags at the heroin mill, provided the jury with sufficient evidence to conclude that she was actively involved in the operations of the conspiracy. Whether she participated with guilty knowledge presented a factual issue that the jury was entitled

to resolve against her on the basis of this circumstantial evidence. *See United States v. DeFiore*, 720 F.2d 757, 762–63 (2d Cir.1983); *United States v. Carson*, 702 F.2d at 362 (quoting *Holland v. United States*, 348 U.S. 121, 139–40, 75 S.Ct. 127, 137–38, 99 L.Ed. 150 (1954) ("The government's proof need not 'exclude every reasonable hypothesis, other than that of guilt' to support a conviction")).

Alliebe Afflic's reliance on *United States v. Soto*, 716 F.2d 989 (2d Cir.1983), is misplaced. In *Soto*, the only evidence of the defendant's guilt was her "sustained and regular presence" in an apartment used as a heroin mill. 716 F.2d at 991. In contrast, the case against Alliebe Afflic here did not rest merely on her presence at any one location. Rather, the evidence—including the surveillances of her directly engaging in what the jury was entitled to find were narcotics transactions—provided precisely what this court found lacking in *Soto:* "some showing of purposeful behavior tending to connect defendant with" the violations of law which were the objects of the conspiracy. *Id.* at 991–92.

### 5. *Tangee Afflic.*

■ Unlike the case against the other appellants, the government's proof was simply not sufficient to support Tangee Afflic's conspiracy conviction. It is true that an M–16 rifle was concealed in her apartment, and the jury could rationally have determined beyond a reasonable doubt that she possessed it knowingly. For this reason, we reject her claim regarding the sufficiency of the evidence on the count three firearms violation. However, the only other evidence against her on the conspiracy charge was a relatively small amount of unexplained wealth ($6,000 worth of jewelry and two fur coats), surveillance testimony concerning her trip to her father's midtown office with her mother, and other surveillance testimony that she was seen handing a "white" bag to her mother in front of her apartment.

■ Even when viewed in the light most favorable to the government, the most this evidence established was that Tangee was aware of the conspiracy and associated with some of its members. By no means, however, was it sufficient to show that she was a knowing participant in it. Her association with her parents, and with Young, even under the circumstances of this case, does not suffice to establish her membership in the conspiracy. We therefore reverse and dismiss on count one as to Tangee Afflic.

### F. *Sufficiency of the Evidence as to the Forfeiture of Myers's House.*

We turn, finally, to Myers's claim that there was insufficient evidence to support the jury's special verdict that his home should be forfeited as part of the profits obtained by him in the drug enterprise. The continuing series of violations that the government proved against Myers occurred during 1982 and 1983. There was no evidence, direct or circumstantial, establishing any narcotics activity, or even suspected narcotics activity, on Myers's part before 1982. By contrast, the proof relating to Myers's purchase of his home at 205 Bradley Avenue consisted solely of a July 31, 1980 deed conveying the house to Myers and to Alliebe Afflic. With the record in this state, Myers contends that the government failed to prove that his home represented profits obtained by him in the narcotics enterprise under § 848(a)(2)(A). We agree.

■ The government argues halfheartedly that since Myers's narcotics enterprise was apparently well-established by 1982, the jury was entitled to draw the inference that it had existed long before that date. However, in order for an asset to be forfeitable under § 848(a)(2)(A), the only basis for forfeiture urged by the government and submitted to the jury, it must be linked to the continuing series of offenses that are proven at trial. *United States v. Dickey*, 736 F.2d 571 at 588.

That simply was not done here. Accordingly, we vacate that portion of the judgment of forfeiture entered by the district court pertaining to Myers's home.

### G. *Remaining Claims.*

We have examined appellants' remaining claims and find them to be without sufficient merit to warrant discussion.

### CONCLUSION

The convictions on count one of Steven Young, Alliebe Afflic, Lloyd Ward, Charles Caviness, and Freddie Myers are affirmed. The conviction of Freddie Myers on count two is affirmed.

The conviction on count one of Tangee Afflic is reversed and dismissed, but her conviction on count three is affirmed. Since there may have been, in the sentencing judge's mind, an interrelationship between the drug and firearms violations of which Tangee Afflic was convicted, the trial court may wish to reconsider the sentence now that the drug charge is dismissed. We therefore remand Tangee Afflic's conviction on count three for resentencing.

JON O. NEWMAN, Circuit Judge, concurring:

I concur in Judge Pratt's comprehensive opinion, but write separately to express a caution concerning expert opinion offered to establish that ambiguous conduct constitutes criminal activity. My concern is prompted by the "Flash Inn Incident," which comprises three of the predicate acts the jury was permitted to rely upon in finding Myers guilty of a "continuing criminal enterprise" offense, 21 U.S.C. § 848 (1982). A telephone call was made from Myers' home at 9:34 p.m. on January 14, 1983, to arrange a meeting with a man at the Flash Inn. Shortly thereafter Myers and another man drove to the inn and waited. Within a half hour, another car arrived with two men; the driver of the second car

spoke with the occupants of Myers' car. All four then entered the inn. Myers' companion entered with a light-colored handbag and exited two minutes later with a dark-colored handbag, which he placed in the trunk of the second car. Myers left two minutes later in his car. Detective Magaletti was permitted to testify that in his opinion a sale of drugs had occurred. The episode raises two distinct issues: (1) whether the expert testimony was admissible and (2) whether the evidence was sufficient to show the commission of predicate offenses.

1. Until this Court's decision last year in *United States v. Carson,* 702 F.2d 351 (2d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983), I would have had serious doubts whether an expert could give an opinion that an observed set of circumstances constituted commission of a crime. The test for admissibility is whether the witness's "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. I do not doubt that an experienced narcotics agent has the requisite knowledge to assist a jury by explaining "the clandestine manner in which drugs are bought and sold," *United States v. Carson, supra,* 702 F.2d at 369. But I question whether an expert's opinion that the events he observes constitute a drug transaction provides very much, if any, assistance to a jury, beyond whatever inference is available to be drawn by the jury from all the evidence. Not too long ago we characterized as "highly unusual" an expert's opinion that observed events showed a defendant to be a "controller" of a gambling operation. *United States v. Sette,* 334 F.2d 267, 269 (2d Cir.1964).

Even if admissible under Rule 702, opinion testimony is still subject to exclusion under Rule 403 "if its probative value is substantially outweighed by the danger of unfair prejudice." Whatever slight probative value arises from a narcotics expert's personal opinion that an observed transac-

tion involved a sale of drugs must be carefully weighed against the distinct risk of prejudice. The "aura of special reliability and trustworthiness" surrounding expert testimony, which ought to caution its use, *United States v. Fosher*, 590 F.2d 381, 383 (1st Cir.1979); *United States v. Amaral*, 488 F.2d 1148, 1152 (9th Cir.1973), especially when offered by the prosecution in criminal cases, *United States v. Green*, 548 F.2d 1261, 1268 (6th Cir.1977), poses a special risk in a case of this sort. That risk arises because the jury may infer that the agent's opinion about the criminal nature of the defendant's activity is based on knowledge of the defendant beyond the evidence at trial. The risk is increased when the opinion is given by "the very officers who were in charge of the investigation," *United States v. Sette, supra*, 334 F.2d at 269.

I recognize, however, that in *United States v. Carson, supra*, we upheld the admission of expert opinion under circumstances very similar to those in this case. Other circuits have also permitted an expert to give his opinion that a defendant's ambiguous conduct is criminal. *United States v. Fleishman*, 684 F.2d 1329, 1335–36 (9th Cir.) (defendant's role as "lookout" in drug transaction), *cert. denied*, 459 U.S. 1044, 103 S.Ct. 464, 74 L.Ed.2d 614 (1982); *United States v. Scavo*, 593 F.2d 837, 840, 843–44 (8th Cir.1979) (defendant's role in gambling operation); *United States v. Masson*, 582 F.2d 961, 963–64 (5th Cir.1978) (same). In light of *Carson* and these other rulings, I cannot say it was error to admit the testimony of Detective Magaletti that Myers was selling narcotics at the Flash Inn on January 14. But the very breadth of the discretion accorded trial judges in admitting such an opinion under Rules 702 and 403 should cause them to give the matter more, rather than less, scrutiny. A trial judge should not routinely admit opinions of the sort at issue here and should weigh carefully the risk of prejudice.

2. Even though it was not error to admit Magaletti's opinion that Myers was selling drugs at the Flash Inn on January 14, the question remains whether the evidence concerning that episode sufficed to permit the jury to find beyond a reasonable doubt that a narcotics violation had occurred on that occasion. The hazard of permitting the opinion in evidence ought to make courts cautious in assessing the sufficiency of a case based heavily on such an opinion. If the observed actions of a defendant do not establish a prima facie case, I do not believe that an expert's opinion that his actions are criminal may carry the prosecution's proof above the requisite line. It is one thing to permit a jury to weigh that opinion in considering an otherwise adequate case; it is quite another matter to let that opinion salvage an insufficient case. In *United States v. Sette, supra*, we rejected the sufficiency of the prosecution's case that rested primarily on an expert's opinion that observed conduct was criminal. "We are cited to no case, and have found none, that remotely justifies this highly unusual method of establishing a prima facie case in a criminal prosecution of this type." *Id.* at 269. In *United States v. Carson, supra*, and the other cases allowing an expert to give an opinion concerning criminal conduct, the evidence, apart from the expert opinion, provided the jury with a substantial basis for finding guilt beyond a reasonable doubt.

If Freddie Myers had been on trial charged with the substantive offenses of possessing and distributing narcotics at the Flash Inn on January 14 and the evidence against him had consisted solely of the observable events of that evening, I would not consider the evidence sufficient to support a conviction on such charges. *See United States v. Suarez*, 487 F.2d 236, 238–40 (5th Cir.1973) (suspicious contact with known narcotics dealer insufficient to support narcotics conviction), *cert. denied*, 415 U.S. 981, 94 S.Ct. 1572, 39 L.Ed.2d 878 (1974); *cf. United States v. Ceballos*, 654 F.2d 177, 184–86 (2d Cir.1981) (suspicious contact with known narcotics dealer insufficient even to establish probable cause to

arrest). However, in determining whether Myers was dealing in drugs that evening, the jury was not limited to the evidence of the wiretapped phone call from his home and the ambiguous events observed at the scene. Strongly reinforcing the inference of a drug transaction was all of the evidence in the case, including the evidence tying Myers to a heroin cutting mill and his vast amounts of cash. When a person already implicated by such evidence participates in a clandestine exchange of handbags, a jury may infer that he was exchanging drugs for money.

For these reasons I agree that the Flash Inn evidence supports Myers' conviction on the criminal enterprise count,[1] and therefore concur in Judge Pratt's opinion.

---

**1.** Had Myers raised the point in the trial court by a specific objection to the charge, I would seriously question whether the Flash Inn episode could provide three violations within the meaning of the "continuing series of violations" element of 21 U.S.C. § 848(b)(2) (1982). Judge Sand permitted the jury to find that Myers' role in the 9:34 p.m. phone call and in the events at the Flash Inn a short time later constituted one violation of 21 U.S.C. § 843(b) (use of telephone to facilitate commission of narcotics offense) and two violations of 21 U.S.C. § 841(a)(1) (possession of narcotics with intent to distribute and distribution of narcotics). Whether or not related conduct can support separate convictions for the substantive offenses of narcotics possession and distribution, the element of a "series of

violations" seems to imply that predicate violations required for conviction of the criminal enterprise offense under 21 U.S.C. § 848 must be substantially distinct in time and place. I doubt if a phone call to arrange a drug sale and the consummation of the sale moments later constitute a "series" of three violations. However, as Judge Pratt points out, Myers' objection to the charge did not claim that the events at the Flash Inn could not establish separate violations for both possession and distribution; on appeal, he does not make the further point that, even if his conduct could constitute two violations of section 841(a)(1), such violations, together with the section 843 violation, are too closely related to be a "series" of three violations within the meaning of section 848(b)(2).